## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 02 2019, 9:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Eric E. Snouffer
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

Christopher M. Forrest
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nicole L. (Nichter) Nolot, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Christopher M. Nichter, <br> *Appellee-Respondent.* | April 2, 2019 <br><br> Court of Appeals Case No. <br> 18A-DR-1201 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Charles F. Pratt, Judge <br><br> The Honorable Sherry A. Hartzler, Magistrate <br><br> Trial Court Cause No. <br> 02D07-0610-DR-613 |

**Altice, Judge.**

## Case Summary

[1] Nicole L. (Nichter) Nolot (Mother) appeals the trial court's order that granted Christopher M. Nichter's (Father) motion to modify child support. She raises

several issues on appeal that we consolidate and restate as: whether the trial court abused its discretion when it reduced Father's child support obligation and, in so doing, declined to impute potential income to Father.

We affirm.

## Facts & Procedural History

Mother and Father married in February 1999. They have three children, born between 1999 and 2003. In 2001, Father and two business partners incorporated a business called Marquis Consulting Services, Inc., which provided solutions to states for the processing and production of driver's licenses and identification cards. In October 2006, Mother filed a petition for dissolution. The parties entered into a mediated settlement agreement, which the trial court approved and incorporated into its February 2007 decree of dissolution. By that time, Marquis Consulting was owned by Father and one partner and was valued at $301,000, according to a valuation that Father obtained from a third party.[1] As is relevant here, the decree awarded all interest in Marquis Consulting to Father; Father was to pay Mother $26,600 per year in maintenance for five years, and she was awarded an equalization judgment in the amount of $50,500. In addition, Father was to pay $566 per week for the support of the parties' children.

---

[1] In their settlement agreement, the parties agreed to waive formal discovery as to the value of assets and liabilities comprising the marital estate.

[4]     In January 2013, Mother filed a petition for modification of child support. The parties entered into a mediated settlement agreement, and, on August 20, 2014, the trial court issued an Order Approving Mediated Settlement Agreement (August 2014 Order). The August 2014 Order reflected the parties' agreement that Father would pay $2200 per week in child support, which was based on weekly gross income figures of $30,862 (or $1,604,824 per year) for Father and $703.85 for Mother. The $2200 figure was a downward deviation from the recommended support obligation, but the parties agreed that $2200 was appropriate and satisfied the current needs of the children.

[5]     Later in 2014, Father and his partner sold Marquis Consulting (the company) along with an associated real estate holding company called CM260 Enterprises[2] to a third party. Under the terms of the sale, Father received lump sum payments of $14,000,000 in 2014 and $2,000,000 in 2016, and a one-time payment in 2017 of $177,000, which was based on the company's performance. As part of the sale, Father executed a covenant not to compete. Also, as part of the sale and in transitioning the company to new ownership, Father agreed to continue working for the new company until on or about December 2015 with an annual salary of approximately $80,000. Father retired in April 2016.

---

[2] Father testified that CM260 was a real estate holding company that he and his partner created to purchase the building that would be leased to Marquis Consulting. He stated that CM260 was not appraised in the sale process and that he and his partner sold it for what they had paid for it.

[6]    In April 2017, Father filed a petition to modify parenting time, custody, and child support, and the matter was set for a January 12, 2018 hearing.[3] Prior to the start of the hearing, the parties submitted a stipulation as to parenting time and custody, such that the only issue left for the trial court's determination was child support. Father requested that the trial court issue special findings and conclusions.

[7]    Father testified at the hearing that he retired in April 2016 and does not intend to return to paid employment. He said that, prior to the sale of the company, he was working 60-100 hours per week. He stated that his partner was initially the primary force in selling the company, but that he supported the idea, both because he could not operate the company without his partner and because the long hours and stress were affecting his health, noting that he had been diagnosed with atrial fibrillation. Father stated that, since the time that he sold Marquis and CM260, he lives off interest and investment income and also has utilized funds in his bank accounts. Father testified and presented evidence showing that for the last several years his investment income had been around

---

[3] On January 2, 2018, the parties filed a Joint Notice of Exclusion of Confidential Information from Public Access, agreeing that all testimony and exhibits presented by both parties at the January 12 hearing would be "Not for Public Access," and on January 4, 2018, the trial court issued an order approving the joint notice and issuing a protective order, which among other things directed that "The Stipulation and Protective Order shall survive the entry of judgment of order in this action, . . . including any appeal thereof, . . . and shall continue in full force and effect, without limitation in time, subject to further order of the Court or modification by agreement of all Parties to the agreement." *Appellant's Appendix Vol. 2* at 88. On appeal, the parties initially filed their briefs and the record as "not for public access," and each filed Notice of Exclusion of Confidential Information from Public Access, relying on the trial court's January 4, 2018 order. This court, on November 9, 2018, issued two related orders finding that the trial court's January 4, 2018 order was issued without a prior hearing and was "insufficient to exclude" the briefs, appendix, transcript, and exhibits from public access and ordering that "[n]o information shall be excluded from public access" on appeal.

$300,000 – $311,314 in 2015, $290,000 in 2016, and approximately $300,000 in 2017 – which figures he said were reduced by around $91,000 in management fees. He testified that he also had an ownership interest in a company that owned a rental property in Hawaii and that it was currently operating at a loss. Father stated that, as of the time of the January 2018 hearing, he owed $6,700,000 in lines of credit for which he paid $15,000 per month in interest. Father was questioned about his current source of income and what income he anticipated in the future, and he responded that it was currently and would continue to be investment income. Father submitted a proposed child support worksheet in which Father had an obligation of $505.47 per week, based on a weekly gross income for Father in the amount of $3997 (x 52 = $207,844 per year) and for Mother in the amount of $1736, which reflected her income from employment increased by in-kind benefits from her current husband's restaurant.

[8] Mother cross-examined Father as to his net worth for the preceding several years based on some financial statements, and she questioned him about expenses that exceeded his investment income. She presented and questioned Father about his 2015 and 2016 tax returns. The 2015 return showed regular income of $379,628 ($311,314 in interest and dividends on Marquis Consulting proceeds and $68,284 for employment with Marquis), and the 2016 return showed regular income of $321,349 ($290,188 in interest and dividends and $31,161 for employment with Marquis). The 2015 and 2016 returns also reflected sales of short-term and long-term capital assets exceeding $1.8 million

and $2.9 million, respectively. She presented evidence of withdrawals from bank accounts, some of which included distributions as well as capital gains from the sales of assets. Mother sought to show that Father had expenditures of over $2,000,000 in 2016 and again in the first nine months of 2017. Father acknowledged that he had withdrawn money from his accounts to buy vehicles, improve his home, and other large expenditures in 2014-2016, but he did not anticipate continuing to do so in the same way, as it would exhaust his savings. With regard to the large expenditures, Father explained that, for some years leading up to the sale of Marquis, he and his partner were pouring their earned income back into the company. For instance, he stated that although his 2014 Schedule K-1 indicated that he earned approximately $1.6 million, he actually took out only $500,000 and kept the remainder in the company. He testified that, once the sale of Marquis was completed, he proceeded with expenditures for home improvements and other large purchases, which he had been delaying. Father stated that another reason that he withdrew large sums was to make tax payments. He also testified that he did not actually receive all monies that appeared as withdrawals on his bank statements because some of those monies were reinvested in investment accounts.

[9] Mother testified as to her annual income of $47,700. She said that she learned that Father had sold his business when, in the latter half of 2015, she "saw something published" about it. *Transcript Vol. 2* at 137. Mother submitted two proposed child support worksheets. In one worksheet, Father had a child support obligation of $4929.47 per week, based on a weekly gross income for

Father in the amount of $42,863 (x 52 = $2,228,876 per year) and a weekly gross income for Mother in the amount of $913 (x 52 = $47,476 per year). In the second worksheet, Father had a weekly child support obligation of $5266.90 per week, based on a weekly gross income for Father in the amount of $45,795 (x 52 = $2,381,340 per year) and a weekly gross income for Mother in the amount of $913 (x 52 = $47,476 per year).

[10] In seeking modification of child support, Father's position was that there had been a substantial and continuing change of circumstances since the August 2014 Order in that he no longer earned what he was earning at that time because he had sold his businesses, retired, and did not intend to return to paid employment. Father maintained that he lived on his annual investment income, reduced by management fees, but acknowledged that he sometimes withdrew funds from investment accounts as well. Mother's position was that Father's lifestyle and expenses far exceeded his investment income, which she maintained reflected that Father did not live exclusively on investment income as he claimed, and therefore, in addition to investment income, capital gains from sales of investment assets as well as other distributions should be considered in calculating Father's weekly gross income for child support purposes.

[11] On April 18, 2019, the trial court issued Confidential Findings of Fact and Conclusions of Law, which modified and reduced Father's child support obligation to $682 per week, based on a weekly gross income for Father of $5784 (x 52 = $300,768 per year) and a weekly gross income for Mother of $913

(x 52 = $47,476). The trial court's findings and conclusions included the following:

> 24. The Court finds that Father has utilized the funds from the sale of his business to make significant expenditures to support his lifestyle, however, the source of those funds are from the sale of an asset that he was awarded in the parties' dissolution. The Court finds that Father lives solely on his investment income earned from the sale of his company. Father also owns a rental company that holds real estate in Hawaii. The Court finds through Father's testimony that the rental company does not make a profit and that Father loses money as a result of that company and its Hawaii real estate. Father's 2015 and 2016 tax returns demonstrate that Father did claim a loss related to the operation of the Hawaii real estate for both years.

> 25. The Court finds that for the years 2015 an[d] 2016, Father earned an average of $300,751.00 in interest and dividends on investments attributable to the sale of Marquis Consulting.

> * * *

> 34. In this matter the parties dispute whether the capital gains from the sale of Father's business should constitute income within the meaning of the Guidelines.

> * * *

> 36. Here the parties agreed and it was ordered that Father be awarded the Marquis Consulting Services, among other things, as part of the equitable division of the marital estate. As also a part of the equitable division of the marital estate, Mother was also granted property as well as a property equalization judgment in the amount of $50,500.00.

37.  Thus, the Court having considered the capital gains from the sale of Marquis Consulting, the Court now concludes that to "utilize the capital gain from Father's sale of the business interest in the calculation of his weekly gross income would "usurp the equitable split of the marital property in the [Marital Settlement and Decree of Dissolution]." [*Scoleri v. Scoleri,* 766 N.E.2d 1211, 1217 (Ind. Ct. App. 2002).]

*Appellant's Appendix Vol. 2* at 36-38.

[12]    In rejecting Mother's request to assign potential income to Father, the court recognized the following considerations:  (1) "[T]he purpose behind determining potential income is to [] 'discourage a parent from taking a lower paying job to avoid the payment of support,'" and "[t]he Court does not conclude that Father sold his business to avoid the payment of significant support"; (2) Father "still earns a significant income from his interest and dividends on his investments"; (3) Father's prior employment was lucrative but he "cannot pursue this same level of employment considering the covenant not to compete";  (4) "[t]here was no evidence presented to establish that there were prevailing job opportunities and earnings levels in the community by which Father could earn the nearly 1.6 million dollars per year"; and (5) [i]t was undisputed that Father was working 60-100 hours per week, and the Guidelines should not be used to require a parent to continue working sixty-hour weeks

"just to meet a support obligation that is based on that higher level of earnings." *Id*. at 39.[4]  Mother now appeals.

## Discussion & Decision

[13]  Mother contends that the trial court erred when it granted Father's request to modify child support and reduced his support obligation.  In dealing with family law matters, "our review is conducted with 'a preference for granting latitude and deference to our trial judges.'"  *Miller v. Miller*, 72 N.E.3d 952, 955 (Ind. Ct. App. 2017) (quoting *In re Marriage of Richardson*, 622 N.E.2d 529, 532 (Ind. 1993)).  We will reverse a trial court's grant or denial of a request for modification of child support only where the court has abused its discretion.  *Sandlin v. Sandlin*, 972 N.E.2d 371, 375 (Ind. Ct. App. 2012).  An abuse of discretion occurs when the trial court misinterprets the law or the decision is clearly against the logic and effect of the facts and circumstances before the court.  *Id*.  We do not reweigh the evidence or judge the credibility of the witnesses upon review; rather, we consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom.  *Id*.  A calculation of child support under the Guidelines is presumed to be valid.  *Id*.

[14]  In granting Father's petition to modify child support, the trial court entered written findings of fact and conclusions pursuant to Father's request.  When

---

[4] Determining that "Father's resources and economic condition is by far superior to Mother's," the trial court ordered Father to pay $15,000 in Mother's attorney fees.  *Appellant's Appendix Vol. 2* at 40.

findings of fact and conclusions thereon are entered by the trial court, we apply a two-tiered standard of review:

> [F]irst, we determine whether the evidence supports the findings and second, whether the findings support the judgment. We do not weigh the evidence or judge the credibility of the witnesses but, rather, consider only that evidence most favorable to the judgment, together with the reasonable inferences that can be drawn therefrom. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard.

*Miller v. Sugden*, 849 N.E.2d 758, 760 (Ind. Ct. App. 2006), *trans. denied* (citations omitted).

[15] In this appeal, Mother claims that the trial court abused its discretion when calculating Father's weekly gross income because (1) it was "based solely on the interest and dividends" – and did not include imputed potential income or in-kind income – "despite the unrefuted evidence of [Father's] voluntary unemployment, lavish lifestyle, and bank records depicting substantial expenditures;" and (2) it "exclude[ed] Father's capital gains from his income." *Appellant's Brief* at 8-9. We address each argument in turn.

### 1. Potential Income

[16] The starting point in determining the child support obligation of a parent is to calculate the weekly gross income for both parents. Ind. Child Support

Guideline 3(A), cmt. 2. Weekly gross income is defined as "actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon in-kind benefits." Child Supp. G. 3(A)(1). "If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income." Child Supp. G. 3(A)(3). A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. *Id.* The commentary to Guideline 3 provides some insight into the purpose of attributing potential income to a parent: One purpose is "to discourage a parent from taking a lower paying job to avoid the payment of significant support" and another is "to fairly allocate the support obligation when one parent remarries, and because of the income of the new spouse, chooses not to be employed." Child Supp. G. 3, cmt. 2(c).

[17] While trial courts have "wide discretion with regard to imputing income to ensure the child support obligor does not evade his or her support obligation," child support orders cannot be used to force parents to work to their full economic potential or make their career decisions based strictly upon the size of potential paychecks. *Meredith v. Meredith*, 854 N.E.2d 942, 947 (Ind. Ct. App. 2006); *Sugden*, 849 N.E.2d at 761. "'Obviously, a great deal of discretion will have to be used in this determination.'" *Miller*, 72 N.E.3d at 955 (quoting Child Supp. G. 3(A), cmt 2(c)). Indeed, we will reverse a trial court's decision

regarding a parent's unemployment or underemployment and imputation of potential income only for an abuse of discretion. *In re Paternity of Pickett*, 44 N.E.3d 756, 762 (Ind. Ct. App. 2015). In determining whether the trial court abused its discretion, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence and reasonable inferences favorable to the judgment. *Id.*

[18]    Here, in calculating child support, the trial court used the weekly gross income figure that Mother proposed for herself. For Father, it used a weekly gross income figure that was more than Father had proposed but less than Mother had proposed. The figure was an amount that the trial court determined represented Father's annual investment income, although not reduced by the management fees as Father had requested.

[19]    In challenging the trial court's calculation of Father's weekly gross income, and, more specifically, its decision not to attribute potential income to him, Mother argues that the trial court "erroneously concluded that in order to attribute potential income to a parent, the court must find that the parent altered his income to avoid the payment of support or other improper motive."[5] *Appellant's Brief* at 9. Stated differently, Mother claims that the trial court was under the mistaken belief that, because the court had found that Father's retirement was

---

[5] Mother refers to Finding No. 19, in which the trial court found that Father did not have any improper motives for his retirement and Conclusion No. 42(c), in which the trial court concluded that Father did not sell his business to avoid the payment of significant support.

not based on a desire to avoid child support or other improper motive, it could not impute potential income to him.

[20] As Mother correctly observes, a parent's avoidance of child support is "not a necessary prerequisite" to imputing income. *See Pickett*, 44 N.E.3d at 766. That is, "it is within the trial court's discretion to impute potential income even under circumstances where avoiding child support is not the reason for a parent's unemployment." *Id*. However, contrary to Mother's suggestion that the trial court misunderstood this premise, the trial court's decision to not impute income was based on a number of considerations.

[21] Again, those reasons, summarized, were: (1) Father did not sell his business to avoid the payment of significant support; (2) Father still earns a significant income from his interest and dividends on his investments; (3) Father's prior employment was lucrative but he "cannot pursue this same level of employment considering the covenant not to compete;" (4) there was no evidence presented concerning prevailing job opportunities and earnings levels in the community "by which Father could earn the nearly 1.6 million dollars per year"; and (5) Father was working 60-100 hours per week, and the Guidelines should not be used to require a parent to continue working sixty-hour weeks "just to meet a support obligation that is based on that higher level of earnings." *Appellant's Appendix Vol. 2* at 39. The trial court's order thus reflects that, in declining to attribute potential income to Father, the court considered five circumstances, including but not limited to the fact that Father did not sell his business to avoid payment of support. Accordingly, its decision

was not, as Mother argued, based only on the finding that Father did not retire in order to avoid paying support.

[22] Mother also challenges the following sentence included in Finding No. 24: "The Court finds that Father lives solely on his investment income earned from the sale of his company." *Id.* at 36. She argues, "This finding is contrary to the evidence presented and it was erroneous for the Trial Court not to impute income to Father based on his expenditures." *Appellant's Brief* at 9. Mother is correct to the extent that evidence presented reflects that in the past few years Father did not live exclusively on his investment income, as his expenditures had exceeded that income, and Father acknowledged that he accessed the proceeds from the sale of his businesses to maintain his lifestyle, pay his bills, travel, improve his home, and buy vehicles. However, Father testified that in 2018 and the foreseeable future, he anticipated living on the income and distributions from his investment accounts, noting that he would not and could not sustain the large expenditures that he made in prior years. We also observe that Finding 24, in full, stated:

> The Court finds that Father has utilized the funds from the sale of his business to make significant expenditures to support his lifestyle, however, the source of those funds are from the sale of an asset that he was awarded in the parties' dissolution. *The Court finds that Father lives solely on his investment income earned from the sale of his company.* Father also owns a rental company that holds real estate in Hawaii. The Court finds through Father's testimony that the rental company does not make a profit and that Father loses money as a result of that company and its Hawaii real estate. Father's 2015 and 2016 tax returns

demonstrate that Father did claim a loss related to the operation of the Hawaii real estate for both years.

*Id*. at 36 (emphasis added). Thus, in our view, Finding 24 when read in its entirety and in context with the remainder of the court's findings and conclusions reflects that the trial court recognized that Father utilized funds from the sale to support his lifestyle but determined that those funds would not be included in Father's weekly gross income. We do not find Finding 24 to be clearly erroneous.

[23] Father asserts that "[e]ven if the Trial Court could have included additional amounts in Father's weekly gross income, it was not required to do so[.]" *Appellee's Brief* at 10. We agree. While it is undisputed that Father voluntarily retired after selling his businesses, this is not a situation in which Father makes no or little income. He still earns in the range of $300,000 per year on his investments. Although he was earning considerably more before he sold the businesses, evidence was presented that he had been working 60-100 hour weeks and that he believed his health was being impacted by the stress and long hours. Our Guidelines are not to be used to force parents to work to their full economic potential or make their career decisions based strictly upon the size of potential paychecks. *Meredith*, 854 N.E.2d at 947; *Sugden*, 849 N.E.2d at 761. Father testified that he intended to live on his investment income in the foreseeable future and not make the same type of large expenditures that he had made after the sale. The trial court evidently accepted the veracity of this testimony, and we will not second-guess the trial court's assessment. *See*

*Sandlin*, 972 N.E.2d at 375. Additionally, we observe that Mother did not present any evidence of Father's occupational qualifications, prevailing job opportunities, or earnings levels in the community against which to compare the approximately $300,000 in income that he was receiving on investments, other than evidence that the parties agreed in 2014 that his annual income was approximately $1.6 million dollars.

[24] Based on the totality of the circumstances, the trial court decided not to assign potential income to Father. We conclude that it was within the trial court's wide discretion to so decide. *Id.* (finding that trial court acted within its discretion to decline to impute income to mother where mother voluntarily left position with company to start own company); *In re Paternity of E.M.P*, 722 N.E.2d 349, 351 (Ind. Ct. App. 2000) (holding that potential income would not be imputed to father based upon his quitting job as garbage collector to take job in which he earned substantially less income, where father quit job due to health concerns and to receive better benefits); *cf. Meredith*, 854 N.E.2d at 948 (finding that it was within trial court's discretion to find that father was voluntarily unemployed where he voluntarily retired from his job as foundry worker making $22,678 per year in addition to pension income of $21,907 (total of $52,565 per year) and took early retirement such that he received only pension income in the amount of $29,978).

## 2. Capital Gains

[25] In a related argument, Mother also asserts that the trial court should have included in Father's weekly gross income, not only Father's investment income,

but also "all monies he was utilizing to pay his living expenses and otherwise supporting his lifestyle," including capital gains from sales of investments. *Appellant's Brief* at 16. Mother is correct that Child Supp. G. 3(A)(1) provides that weekly gross income includes income from any source, including capital gains. However, the Commentary to the Guidelines recognizes the "fact-sensitive" nature of computing child support and cautions that determining income is more difficult when irregular or nonguaranteed forms of income are involved. Child Supp. G. 3(A), cmt. 2(b).

[26] In this case, Father and Mother agreed when their marriage was dissolved in 2007, he would retain his interest in Marquis Consulting, and, in exchange, Father incurred more marital debt and paid Mother maintenance for five years as well as a cash equalization judgment. Father sold his businesses in 2014 and received lump-sum payments in 2014 and 2016 and a third payment in 2017. He invested those payments and earns investment income thereon. Bank statements and other evidence reflects that he sold and used some investments to make expenditures, in some years totaling over $2,000,000. Father acknowledged that he spent more than what he earns in interest income each year and testified that he was living on the $300,000 income as well as "some of the money [he] has in the bank accounts." *Transcript Vol. 2* at 90. Mother maintains that "the capital gains Father realized from the sale of his income producing assets should be attributed to him as he utilizes them." *Appellant's Brief* at 23.

In declining to include the capital gains from the sale of Father's investments in the calculation of his weekly gross income, the trial court stated:

> 37. [T]he Court having considered the capital gains from the sale of Marquis Consulting, the Court now concludes that to "utilize the capital gain from Father's sale of the business interest in the calculation of his weekly gross income would "usurp the equitable split of the marital property in the [Marital Settlement and Decree of Dissolution]." *Scoleri*, 766 N.E.2d at 1217.

*Appellant's Appendix Vol. 2* at 38.

In *Scoleri,* relied on by the trial court in the present case, the parties disputed whether an early withdrawal from the father's 401(k) account constituted income within the meaning of the Guidelines. There, as part of the parties' 1994 property settlement agreement, the father received the 401(k) account and the mother received the marital home. In December 1997, the father's job was terminated due to plant closure and layoffs, and he took a lower-paying job. At the time that he left the company, his 401(k) was valued at $35,000. On August 3, 1998, Father "cashed in" the full amount of his 401(k) and, less the incurred penalty, he received $28,000. On August 24, 1998, father filed a petition to modify child support due to the job change and lower income. The trial court denied the father's petition and he appealed. Specifically, the father argued that the trial court had erred when it considered the early withdrawal from his retirement account as income that should be included in his child support obligation calculation.

[29]     After discussing the nature of a 401(k) plan, we determined that because the withdrawal was received by the father, immediately available for use, and it reduced the father's living expenses, the withdrawal constituted income within the meaning of the Guidelines. *Id*. at 1217. However, this court determined that it was error for the trial court to include the cash withdrawal in the calculation of the father's child support obligation because he had received the 401(k) in the dissolution in exchange for Mother retaining the marital home. *Id.* at 1217-18. Specifically, we found that "to utilize the return from Father's early withdrawal from his 401(k) in the calculation of his weekly gross income would usurp the equitable split of the marital property in the summary dissolution decree[,]" and, consequently, we deemed it "inequitable to utilize Father's portion of the marital property, his 401(k) account, in the calculation of his weekly gross income." *Id.* at 1217-18.

[30]     Likewise, here, the parties agreed and the trial court entered a dissolution decree in 2007 awarding Father his business interest as part of the marital property distribution. Upon Father's April 2017 petition to modify, the trial court determined that to utilize the capital gain from Father's sale of investments – investments that represented proceeds from the sale of his business interests – would effectively usurp the split of marital property in the dissolution decree. Thus, the trial court considered the matter of capital gains, but concluded the gains should be excluded from the child support calculation. Mother has not shown that the trial court abused its discretion in doing so.

[31] Again, "[a] trial court's calculation of child support is presumptively valid." *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008). In this case, we cannot say that the trial court's determination of weekly gross income, and accompanying calculation of child support, was an abuse of its discretion.

[32] Judgment affirmed.

Najam, J. and Pyle, J., concur.